<u>IN THE UNITED STATES DISTRICT COURT</u>
<u>FOR THE EASTERN DISTRICT OF PENNSYLVANIA</u>

MARK S. GROFF                    )
                                 )
            Plaintiff            )
                                 )    Civil Action
         vs.                     )    No. 11-cv-03641
                                 )
CITY OF READING, PENNSYLVANIA    )
and                              )
WILLIAM M. HEIM, Individually,   )
                                 )
            Defendants           )

                    *    *    *

APPEARANCES:

        BROOKE M. BOYER, ESQUIRE
            On behalf of Plaintiff

        ANDREW B. ADAIR, ESQUIRE
        CHRISTINE D. STEERE, ESQUIRE
            On behalf of Defendants

                    *    *    *

                <u>O P I N I O N</u>

JAMES KNOLL GARDNER
United States District Judge

        This matter is before the court on Defendants, City of

Reading and William M. Heim's Motion for Summary Judgment

Pursuant to Fed.R.Civ.P. 56, filed April 20, 2012 together with

Defendants, City of Reading and William M. Heim's Memorandum of

Law in Support of Motion for Summary Judgment Pursuant to

Fed.R.Civ.P. 56.[1]  On May 7, 2012 Plaintiff Mark Groff's

Memorandum of Law in Opposition to Defendants' Motion for Summary

_____

        [1]     Together with their motion and memorandum of law, defendants also
filed Defendants City of Reading and William M. Heim's Statement of Undisputed
Material Facts in Support of Motion for Summary Judgment Pursuant to
Fed.R.Civ.P. 56.

Judgment Pursuant to F.R.C.P. 56 was filed.[2]  For the following reasons, I grant defendants' motion for summary judgment in part and deny it in part.

<u>SUMMARY OF DECISION</u>

I deny defendants' motion for summary judgment on the First Count of plaintiff's Complaint against defendant City of Reading, Pennsylvania, alleging a violation of plaintiff's federal procedural due process rights.  Specifically, I conclude that there are questions of fact which preclude granting summary judgment to the City, and which must be determined at the jury trial of this matter.  More specifically, I conclude that the associations policy of the City of Reading Police Department's General Order 0484 is not unconstitutionally vague on its face, but may be unconstitutionally vague in its application to plaintiff (depending on how the jury resolves certain factual disputes).

In addition, I conclude that it would be improper to grant summary judgment to the City because it is for the jury to determine the basis for plaintiff's termination by the City. Specifically, the jury must determine whether plaintiff was

---

[2]    Together with his memorandum of law, plaintiff also filed Plaintiff Mark Groff's Counterstatement of Undisputed Material Facts and Plaintiff's Reply to Defendant's Statement of Undisputed Facts.

Defendants City of Reading and William M. Heim's Reply to Plaintiff's Counterstatement of Undisputed Material Facts was filed on May 18, 2012.  Defendants' Reply in Support of Motion for Summary Judgment Pursuant to Fed.R.Civ.P. 56 was filed on May 21, 2012.

terminated as a police officer by the City of Reading only for a violation of the police department's associations policy (as alleged by plaintiff) or for the multiple reasons advanced by defendants.

I further conclude that plaintiff has established each element of municipal liability based upon the policies of the City of Reading Police Department.

Finally, I grant defendants' motion for summary judgment on the Second Count of plaintiff's Complaint, which is a claim against defendant William M. Heim, individually.  Although defendant Heim is the Reading Chief of Police, he was sued in the Second Count only in his individual capacity.  Like the First Count against the City, the Second Count against Chief Heim alleges violation of plaintiff's federal procedural due process rights.

I entered judgment in favor of defendant William M. Heim, individually; dismissed the Second Count of plaintiff's Complaint; and dismissed defendant Heim as a party to this action.[3]

---

[3] It is the sense of the Order accompanying this Opinion that defendant William M. Heim is dismissed as a party to this action because (1) the First Count of this two-count Complaint is a count by plaintiff Mark S. Groff against defendant City of Reading, Pennsylvania only; (2) the Second Count is a count by plaintiff against defendant William M. Heim only; and (3) the Second Count has been dismissed.

JURISDICTION

Jurisdiction in this case is based upon federal question jurisdiction pursuant to 28 U.S.C. § 1331.

VENUE

Venue is proper pursuant to 28 U.S.C. § 1391(b) because the events giving rise to plaintiff's claims allegedly occurred in Berks County, Pennsylvania, which is located within this judicial district.

Plaintiff's Claims

On June 6, 2011 plaintiff Mark. S. Groff filed a two-count Complaint against the City of Reading, Pennsylvania and William M. Heim, the Chief of Police of the City of Reading.

Count I of plaintiff's Complaint[4] alleges a cause of action pursuant to 42 U.S.C. § 1983 against the City of Reading, Pennsylvania for violation of plaintiff's procedural due process rights under the Fourteenth Amendment of the United States Constitution.

Count II avers a claim against Chief Heim, in his individual capacity, for a violation of plaintiff's federal procedural due process rights.

---

[4]    The two counts in plaintiff's Complaint are labeled "First Count" and "Second Count".  For ease of reference, I will refer to them in this Opinion as "Count I" and "Count II".

STANDARD OF REVIEW

In considering a motion for summary judgment, the court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Federal Home Loan Mortgage Corporation v. Scottsdale Insurance Company, 316 F.3d 431, 433 (3d Cir. 2003). Only facts that may affect the outcome of a case are "material". Moreover, all reasonable inferences from the record are drawn in favor of the non-movant. Anderson, supra.

Although the movant has the initial burden of demonstrating the absence of genuine issues of material fact, the non-movant must then establish the existence of each element on which it bears the burden of proof. See Watson v. Eastman Kodak Company, 235 F.3d 851, 857-858 (3d Cir. 2000).

Plaintiff cannot avert summary judgment with speculation or by resting on the allegations in his pleadings, but rather must present competent evidence from which a jury could reasonably find in his favor. Ridgewood Board of Education v. N.E. for M.E., 172 F.3d 238, 252 (3d Cir. 1999); Woods v. Bentsen, 889 F.Supp. 179, 184 (E.D.Pa. 1995).

FACTS

Based upon the pleadings, record papers, depositions, affidavits, exhibits and the uncontested facts submitted by defendants in their statement of undisputed facts and by plaintiff in his counterstatement of facts, the pertinent facts are as follows.

Plaintiff Mark Groff was employed by the City of Reading Police Department in January 2005 as a civil-service police officer.  All police officers hired by the City of Reading Police Department go through a civil-service process which is governed by the City's Civil Service Board.

Defendant William M. Heim is currently employed as the Reading Chief of Police.  Chief Heim was been employed in this capacity for nine years.  Chief Heim's duties are contained in the Police Department's General Order No. 0202.

General Order No. 0202 grants Chief Heim the authority and responsibility for the management, planning, direction and control of the operations and administration of the Reading Police Department.  General Order No. 0202 further grants Chief Heim the authority to recommend appointments, promotions, suspensions, demotions or termination of employment to the Reading Mayor or to the Reading City Council.

When plaintiff was hired as a Reading Police Officer, General Order No. 0408 was distributed to him.  This General

-6-

Order purported to be a progressive disciplinary policy to which Officer Groff was subject.  General Order No. 0408 was issued on May 15, 1999, effective September 30, 1999.  The copy of General Order No. 0408 given to plaintiff contained penalty recommendations and reckoning periods.[5]

The penalty recommendations and reckoning periods were rescinded by the March 10, 2003 Order of the Pennsylvania Labor Relations Board.  However, those penalty recommendations and reckoning periods were not removed from the copy of General Order No. 0408 given to plaintiff and other officers hired after the March 10, 2003 Order.

While there is ample evidence in the record to demonstrate that Chief Heim and the Fraternal Order of Police knew that the penalty recommendations and reckoning periods were rescinded from General Order No. 0408, there is no evidence that plaintiff was ever specifically notified of that fact.  To the contrary, plaintiff contends that he believed that all the penalty recommendations and reckoning periods were a part of General Order No. 0408.

---

[5]      Neither General Order 0408, nor the parties in their respective briefs, define the term "reckoning period".  The "reckoning period" that was previously part of the penalty structure for violations of general Order 0408 limits the number of violations previously committed by a police officer (if any) which may be considered to determine, for purposes of penalty enhancement, whether the current violation is the officer's first, second, or third offense.  If the "reckoning period" is two years, only violations committed within a two-year period before the instant offense may be considered for penalty enhancement.  If the reckoning period is four years, only violations committed during the previous four years may be considered for penalty enhancement.

Plaintiff received training from the Municipal Police Officer's Education & Training Commission ("MPOETC").  Part of plaintiff's MPOETC training covered gangs and outlaw motorcycle clubs, including the Pagans and Hell's Angels.  Plaintiff was instructed that outlaw motorcycle gangs attempt to legitimize themselves by joining mainstream motorcycle groups.

In the motorcycle world, outlaw motorcycle clubs, sometimes known as motorcycle gangs, are part of the one percent subculture which has no respect for law and order and which lives by its own rules.  Outlaw motorcycle gangs are commonly involved in criminal activity, including, but not limited to, prostitution, drug trafficking and murder for hire.

Plaintiff was a member of the United States Marine Corps from 1989 until receiving an honorable discharge in 1993. During his employment with the Reading Police Department, plaintiff was a member of the Reading Chapter of the Leathernecks Motorcycle Club ("Leathernecks"), a nationally recognized motorcycle club with membership comprised of honorably discharged United States Marines.

Plaintiff became a member of the Leathernecks in 2000. During his affiliation with the Reading Leathernecks, plaintiff held the position of Sergeant-at-Arms for two-to-three years.  As Sergeant-at-Arms, plaintiff was responsible for the security of the club.  While plaintiff was a member of the Leathernecks, it

-8-

was not an outlaw motorcycle gang, nor was it a support club of the Pagans.

In June 2008, members of the Reading Police Department observed plaintiff on different occasions with members of the Pagans Motorcycle Club ("Pagans").  The Pagans is one of four notorious outlaw motorcycle gangs, along with the Hell's Angels, the Warlocks and the Outlaws Motorcycle Club.  The Pagans, like many other outlaw motorcycle gangs, have a number of support, or "sister", motorcycle clubs pledging their allegiance to the Pagans.

The Pagans are involved in every facet of criminal activity which produces a profit for them, including, but not limited to, the manufacturing and distribution of methamphetamines, prostitution, and serving as hired hit men for organized crime.  The Pagans have also been linked with white supremacy organizations.  The Pagans use violence and intimidation to control other motorcycle clubs and citizens.

There are several outlaw gangs operating in the Reading, Pennsylvania area, but the Pagans are the controlling outlaw motorcycle gang.  During the time frame of this case, Bobby Quinter was President of the Reading Chapter of the Pagans. Mr. Quinter uses the moniker "Standup".  Mr. Quinter is well-known to law enforcement officers in the Reading, Pennsylvania area.

Plaintiff knew that Mr. Quinter was a "bad guy" at the time that he had contacts with him.  Mr. Quinter usually armed himself with hammers, knives, and ax handles; and plaintiff once observed a ball peen hammer in Mr. Quinter's bag.  Another member of the Pagans known as "Hillbilly" was known to carry a gun.

Members of both the Leathernecks and the Pagans knew that plaintiff was a Reading Police Officer.  Plaintiff worked very hard on his off-duty appearance, attempting to not appear to be a police officer because it could cause him problems outside his employment.

In June 2008 plaintiff was observed by Reading Police Sergeant Madison Winchester riding his motorcycle, while off-duty, with at least one other individual who was wearing a Pagans patch on his jacket.  The specifics of this contact are disputed by the parties.  Plaintiff contends that he was riding on his own when the members of the Pagans "rode up" on him and asked to speak to him, to which he consented.  Defendants contend that it appeared that plaintiff was being friendly with the Pagans and rode away with them.

The next significant incident involving plaintiff and the Pagans occurred on March 17, 2009, St. Patrick's Day, at Trooper Thorn's Irish Beef House in Reading.  On that date plaintiff was drinking and socializing with co-workers from the

Reading Police Department.  At some point, plaintiff discovered that his motorcycle would not start.

Plaintiff called his wife, Nicole L. Mengel, to come to Trooper Thorn's to assist plaintiff in getting himself and his motorcycle home.  When his wife arrived at Trooper Thorn's, plaintiff and fellow Reading Police Officer Andrea Harris were involved in a loud argument in the parking lot outside the establishment.  During the argument, plaintiff threw his cell phone to the ground and started walking down Route 10.

After plaintiff started walking away from Trooper Thorn's, his wife picked up his cell phone.  The phone rang while she was holding it, and she answered the phone.  Bobby Quinter, President of the Reading area Pagans, was on the line.  He asked "whats up?"  Ms. Mengel denies calling Mr. Quinter.  However, Mr. Quinter's phone number was programmed into plaintiff's cell phone.

During her conversation with Mr. Quinter, Ms. Mengel asked him to come to Trooper Thorn's to help with plaintiff's motorcycle.  Mr. Quinter eventually arrived at Trooper Thorn's. In addition, another member of the Pagans, "Hillbilly", also arrived at Trooper Thorn's.  When Mr. Quinter arrived at Trooper Thorn's, both Ms. Mengel and plaintiff spoke with him.  Hillbilly jump started plaintiff's motorcycle, and Mr. Quinter drove plaintiff's motorcycle back to plaintiff's house.

On this occasion, plaintiff did not utilize other means of getting his motorcycle home, including having it towed, putting it in the back of his wife's pick-up truck, or permitting a fellow Reading Police Officer to drive it home for him. Rather, plaintiff insisted that Mr. Quinter was the only person who he would let drive his motorcycle home.

On April 5, 2009, plaintiff and his wife attended a motorcycle event called ("Show N' Tell"), hosted by the Outsiders Motorcycle Club ("Outsiders"), at the Gargoyle Lounge in Reading. Plaintiff's friend, Enzio Colodonato, is a member of the Outsiders.

Although the Pagans were not invited to the Outsiders "Show N' Tell" event, members of the Pagans, including Bobby Quinter, attended the event nonetheless.  When Mr. Quinter arrived, he was greeted by plaintiff with a half-hug and pat on the shoulder.  Thereafter, plaintiff and Mr. Quinter engaged in a private conversation which lasted approximately five minutes. Plaintiff's actions were observed by members of the Reading Police Department who had set up surveillance of the event for intelligence-gathering purposes after the Police Department learned of the motorcycle event.

On April 6, 2009, Chief Heim commenced an Administrative Inquiry regarding plaintiff's suspected contacts with the Pagans.  Chief Heim had been previously apprised about the

contacts by plaintiff with members of the Pagans in June 2008 but chose not to address the situation at that time because he did not want to drive plaintiff's conduct "underground" to avoid detection.

The purpose of the Administrative Inquiry was to determine whether plaintiff had voluntary, off-duty, interaction with members of the Pagans, and whether such conduct, if it had occurred, placed plaintiff or the Reading Police Department in a position which reflected unfavorably upon either.

Reading Police Department General Order 1402 is an internal affairs policy which states, in part, that "[i]t shall be the policy of the Reading Bureau of Police to thoroughly and expeditiously investigate allegations of misconduct on the part of its members. Members shall have an obligation to cooperate during investigations."

On April 8, 2009, as part of the Administrative Inquiry, police Lieutenant Scott Weidner, interviewed plaintiff regarding his suspected association with the Pagans.

During the interview with Lt. Weidner, plaintiff acknowledged that he has known Mr. Quinter for a number of years based upon both on- and off-duty encounters with Mr. Quinter. Plaintiff first met Mr. Quinter in the 1980s or 1990s prior to becoming a police officer. Plaintiff admitted that he shows the Pagans respect every time he sees them, greeting them with a

shoulder pat hug and making a point to talk to them to avoid violence with them.  Plaintiff explained that if one is not respectful to outlaw motorcycle clubs, like the Pagans, they will take respect from you, sometimes by beating you up, or by taking other club member's "colors" or jackets.

The Pagans expect other motorcycle clubs to follow Pagan customs and courtesies.  Plaintiff admitted that he had worked for approximately four years to negotiate a situation where the Pagans do not inflict violence on plaintiff's motorcycle club.

Following the investigation by Lt. Weidner, police Captain Robert H. Schafer, Jr., reviewed the investigative interviews and initiated recommendations for discipline of plaintiff.  Ultimately, as a result of the Administrative Inquiry, Chief Heim determined that plaintiff's conduct and plaintiff's interview answers warranted charges of violating four sections of General Order 0408.

Specifically, plaintiff was alleged to have violated General Order 0408,  Section IV, subsection A(1), Violation of Rules, which provides:  "Officers shall neither commit any acts nor omit any acts [which] constitute a violation of the rules, regulations, directives, orders or policies of the Department." The penalties listed for a violation of this section are: first offense: written reprimand — two days suspension; second offense:

-14-

three-to-ten days suspension; third offense: eleven days suspension to termination of employment.  The reckoning period for this section is two years.

Plaintiff was further alleged to have violated Section IV, subsection A(3), Unbecoming Conduct, which provides:

> Officers shall conduct themselves at all times, both on and off duty, in such manner as to reflect favorably on the Department.  Conduct unbecoming an Officer shall include that which tends to bring the Department into disrepute or brings discredit upon the Officer or the Department and which affects the efficiency of the Department or the Officer.

The penalties listed for a violation of this section are: first offense: written reprimand to termination of employment; second offense: three days suspension to termination of employment; third offense: eleven days suspension to termination of employment.  The reckoning period is two years.

In addition, plaintiff was alleged to have violated Section IV, subsection A(6), Associations, which provides:

> Officers shall neither associate with, be employed by, not conduct business with persons who they know, or should know, are racketeers, sexual offenders, gamblers, suspected felons, persons under criminal investigation or indictment, or who have a reputation in the community for present involvement in felonious or criminal behavior, except as necessary to the performance of official duties or where unavoidable because that individual is a relative of the officer.

The penalties listed for a violation of this section are: first offense: five-to-ten days suspension; second offense:

eleven-to-thirty days suspension; third offense: termination of employment.  The reckoning period is four years.

Finally, plaintiff was alleged to have violated Section IV, subsection C(5), False Testimony, which provides: "Officers shall not give false testimony in criminal or administrative investigations."

The penalties listed for a violation of this section are: first offense: ten days suspension to termination of employment; second offense: termination of employment.  The reckoning period is two years.

Chief Heim concluded that plaintiff violated Section IV, subsection A(1), Violation of Rules, because of the other rules violations set forth in the Specification of Charges lodged against plaintiff.  He further determined that plaintiff violated Section IV, subsection A(3), Unbecoming Conduct, by associating with a known outlaw motorcycle gang which engaged in criminal activity.  The Chief reasoned that such association brought the Reading Police department into disrepute when both fellow police officers and members of the public saw plaintiff interacting with the Pagans, especially when plaintiff was not on duty engaged in official police business.

After reviewing plaintiff's interview with Lt. Weidner, Chief Heim concluded that plaintiff regularly and voluntarily deferred to the Pagans and agreed to abide by the rules set by an

outlaw motorcycle gang which constituted both willful association with the Pagans in violation of Section IV, subsection A(6), Associations, and conduct unbecoming a police officer in violation of Section IV, subsection A(3), Unbecoming Conduct.

Chief Heim concluded that plaintiff violated Section IV, subsection C(5), False Testimony, because plaintiff denied being friendly with the Pagans.

On June 10, 2009 Chief Heim issued plaintiff a Specification of Charges, Disciplinary Action No. 2009-010 which charged plaintiff with the above four violations.  In response to the Specification of Charges, plaintiff was afforded the opportunity to participate in, and requested, a pre-disciplinary meeting to present Chief Heim with any mitigating circumstances or information which plaintiff wanted to present to Chief Heim prior to a determination of the level of discipline that would be imposed.

On June 16, 2009, plaintiff attended a meeting with Chief Heim together with a representative of the Fraternal Order of Police, the union which represents Reading Police Officers. Plaintiff was given the opportunity to present any additional information at the meeting.

In the pre-disciplinary meeting with Chief Heim, plaintiff admitted that he attended motorcycle events attended by the Pagans.  At such events it was required that members of the

Leathernecks, including plaintiff, pay respect to the Pagans so that the Pagans would not commit violence on the Leathernecks. Specifically, it was required that the Leathernecks, including plaintiff, greet Pagan members warmly with handshakes, recognize the Pagans, and be friendly with them.  In addition, plaintiff admitted that he bought lottery tickets from the Pagans.

Following Chief Heim's meeting with plaintiff, the Chief consulted with his command staff and decided to recommend to the Mayor of Reading that plaintiff's employment as a police officer be terminated for violation of the four sections of General Order 0408 and based upon plaintiff's prior conduct as a police officer.  Following the pre-disciplinary meeting and after receiving the Recommendation of Charge Memo, plaintiff requested a meeting with the Mayor concerning the level of discipline being considered.  There is no indication in the record that any meeting took place between plaintiff and the Mayor.

On June 24, 2009, Reading Mayor Thomas M. McMahon, terminated plaintiff's employment with the police department. Pursuant to the collective bargaining agreement between the Reading Police Department and the Fraternal Order of Police, plaintiff requested a grievance hearing with the Reading City Council concerning his termination from employment.

On August 11, 2009 the City Council conducted a hearing.  Plaintiff was present and was represented by counsel,

-18-

through the Fraternal Order of Police.  Plaintiff was permitted to present his own testimony and the testimony of other witnesses at the hearing.

On August 20, 2009 the City Council, by Resolution No. 103-2009, upheld and affirmed the termination of plaintiff's employment as a police officer.

As permitted by the collective bargaining agreement, plaintiff appealed the City Council's Resolution to private arbitration.  On December 16 and 17, 2009 Arbitrator Timothy J. Brown took testimony regarding plaintiff's appeal.  During the private arbitration hearing, plaintiff was represented by counsel and presented his own testimony, the testimony of other witnesses, and a defense.

On March 3, 2010, Arbitrator Timothy J. Brown denied plaintiff's appeal and upheld the termination of his employment.

In addition to his termination appeal, plaintiff also filed for unemployment compensation benefits.  On September 1, 2009 a hearing was conducted before an Unemployment Compensation Referee.  The Referee denied plaintiff unemployment compensation benefits.

Plaintiff appealed the decision of the Referee to the Unemployment Compensation Board of Review which reversed the decision of the Referee, and granted plaintiff unemployment compensation benefits.

The City of Reading appealed to the decision of the Unemployment Compensation Board of Review to the Commonwealth Court of Pennsylvania.  The Commonwealth Court upheld plaintiff's unemployment compensation benefits award.

<u>CONTENTIONS OF THE PARTIES</u>

<u>Contentions of Defendants</u>

Defendants contend that they are entitled to summary judgment on each claim asserted by plaintiff Mark S. Groff.

Defendants offer six reasons for why summary judgment in their favor is proper: (1) plaintiff only challenges the constitutionality of the associations policy and does not challenge the constitutionality of the other three policies under which he was terminated.  Thus, plaintiff cannot state a claim against defendants even if the associations policy is unconstitutionally vague; (2) plaintiff cannot prove a violation of right secured by the United States Constitution or federal law; (3) General Order No. 0408 is not unconstitutionally vague; (4) plaintiff has not proved a violation of procedural due process because plaintiff received the process that was due; (5) Chief Heim is entitled to qualified immunity; and (6) plaintiff cannot prove municipal liability.

<u>Contentions of Plaintiff</u>

Plaintiff contends that defendant City is not entitled to summary judgment on Count I alleging a violation of his

procedural due process rights, but concedes that Count II
alleging liability against Chief Heim should be dismissed.[6]

Initially, plaintiff contends that his termination from
employment as a Reading Police Officer was based upon his alleged
"association" with the Pagans Motorcycle Club.  Plaintiff further
contends that the term "association" is unconstitutionally vague
as it applies to his conduct which admittedly consisted of a
number of contacts with the Pagans.

Specifically, regarding Count I, plaintiff contends
that the language of General Order 0408, Section IV, subsection
A(6), Associations, is unconstitutionally vague on its face.
Moreover, plaintiff contends that the copy of General Order 0408
given to him and to other members of the Reading Police
Department contains a progressive disciplinary policy, and that
he was never advised that the progressive disciplinary aspect of
General Order 0408 were not in effect.

More specifically, plaintiff contends that he had no
notice that he could be fired for his association with the Pagans
because the copy of the policy given to him purported to provide
for a maximum ten-day suspension for a first offense violation of
the associations policy.  Thus, what plaintiff argues is that he
was on notice of the policy regarding associations, but even if
the language of the policy itself is not unconstitutionally

---

[6]     See Plaintiff Mark Groff's Memorandum of Law in Opposition to
Defendants' Motion for Summary Judgment Pursuant to F.R.C.P. 56, at page 4.

vague, he was not advised of the possible termination penalty for a first offense violation of the policy.

DISCUSSION

Section 1983

Plaintiff's constitutional claims are actionable against defendants through 42 U.S.C. § 1983.  Section 1983 is an enabling statute that does not create any substantive rights, but provides a remedy for the violation of federal constitutional or statutory rights.  Gruenke v. Seip, 225 F.3d 290, 298 (3d Cir. 2000).  Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

Thus, to state a claim under Section 1983, a plaintiff must demonstrate that defendant, acting under color of state law, deprived plaintiff of a federal constitutional or statutory right.  Parratt v. Taylor, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420, 428 (1986); Chainey v. Street, 523 F.3d 200, 219 (3d Cir. 2008) (quoting Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006)).

A defendant acts under color of state law when he exercises power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." West v. Atkins, 487 U.S. 42, 49, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40, 49 (1988); Bonenberger v. Plymouth Township, 132 F.3d 20, 23 (3d Cir. 1997).

### Constitutionality of Associations Policy

Initially, I address whether the associations policy of General Order 0408 is unconstitutionally vague.  Defendants argue that the associations policy is not unconstitutionally vague. Plaintiff contends that it is.  Plaintiff's claim is that the associations policy under which he was dismissed did not put him on notice that he could be dismissed for engaging in the conduct for which he was discharged.  Moreover, plaintiff claims that the use of his prior disciplinary record violated the reckoning periods set forth in General Order 0408.  Plaintiff raises both a facial challenge and an "as-applied" challenge to General Order 0408.

The relevant inquiry concerning whether a policy is unconstitutionally vague is whether the statute or standard is:

> sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties...consonant alike with ordinary notions of fair play and the settled rules of law.  And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to

> its application violates the first essential of
> due process of law.

Connally v. General Construction Company, 269 U.S. 385, 391,
46 S.Ct. 126, 127, 70 L.Ed.2d 322, 323 (1926).

Moreover, in Arnett v. Kennedy, 416 U.S. 134,
94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) the United States Supreme
Court reiterated that in the public employment context, the
vagueness doctrine is based upon fair notice that certain conduct
puts someone at the risk of discipline.  Such standards are not
void for vagueness as long as ordinary persons, using ordinary
common sense are notified that certain conduct will put them at
risk of certain discipline.

The standard or statute is required to be analyzed
regarding whether it is vague as applied to the affected party.
See United States v. Mazurie, 419 U.S. 544, 550, 95 S.Ct. 710,
714, 42 L.Ed.2d 706, 713 (1975).  In San Filippo v. Bongiovanni,
961 F.2d 1125, 1135 (3d Cir. 1992) the United States Court of
Appeals for the Third Circuit referred to the as-applied analysis
as "the commonsense approach".

Here, as quoted above,General Order 0408 Section IV,
subsection A(6), Associations, states:

> Officers shall neither associate with, be employed
> by, nor conduct business with persons who they
> know, or should know, are racketeers, sexual
> offenders, gamblers, suspected felons, persons
> under criminal investigation or indictment, or who
> have a reputation in the community for present
> involvement in felonious or criminal behavior,

-24-

except as necessary to the performance of official
duties or where unavoidable because that indi-
vidual is a relative of the officer.

In San Filippo, the discharge of a Rutgers University
professor was at issue.  The applicable University policy was
that professors could be fired for "failure to maintain standards
of sound scholarship and competent teaching."  The Third Circuit
held that the University policy in San Filippo was not
unconstitutionally vague.

Similarly here, the associations policy of general
Order 0408 is less vague on its face than the language contained
in the University policy in San Filippo.  Here, the policy states
exactly what a police officer is not allowed to do, and any
person with common sense would be able to figure out what it
prohibits.  Accordingly, plaintiff had notice of the conduct
which the policy prohibited.

The language of the associations policy is
significantly more specific than the language upheld by the Third
Circuit in San Filippo and the language of other cases cited
therein.  Therefore, the language of the associations policy is
not void for vagueness on its face.  However, that does not end
the analysis of plaintiff's procedural due process claim.

Plaintiff further claims that the associations policy
under which he was dismissed did not put him on notice that he
could be dismissed for engaging in conduct for which he was

-25-

discharged.   Moreover, plaintiff claims that the use of his prior disciplinary record violated the reckoning periods set forth in General Order 0408.  This raises a question whether the associations policy is void for vagueness as applied to plaintiff.

Plaintiff argues that the associations policy is vague because he was fired, and the associations policy states that he could only be suspended for a maximum of ten days for a first offense.  Plaintiff contends, and there is no evidence in the record to dispute, that he did not know that the progressive discipline and reckoning periods set forth in General Order 0408 were no longer a part of General Order 0408.

Rather, plaintiff contends that the copy of General Order 0408 which he was given included the progressive discipline policy and the reckoning periods.  Thus, drawing all reasonable inferences from the record in favor of plaintiff as the non-moving party, as I am required to do under the applicable standard of review for purposes of summary judgment, while the language of the associations policy is not unconstitutionally vague on its face, its application to plaintiff may make it so because plaintiff was not informed that his employment could be terminated for violation of the policy.

Furthermore, it will be for the jury to determine whether it finds plaintiff's testimony credible regarding what he

knew about the applicability of the progressive discipline and reckoning provisions of the associations policy.

Accordingly, I conclude, for the purposes of this summary judgment motion, that plaintiff may be able to prove that the associations policy contained in General Order 0408 is unconstitutionally vague as it is applied to him and to the facts of this case concerning termination of his employment for violation of the policy.  Thus, I deny defendants' motion for summary judgment on this issue.

<u>Reasons for Discharge</u>

Defendants contend that because plaintiff only challenges the constitutionality of the associations policy and does not challenge the constitutionality of the other three policies under which he was terminated, plaintiff cannot prevail on his procedural due process claim even if the associations policy is unconstitutionally vague.  I disagree.

To properly assert a procedural due process claim, plaintiff must first establish that there is a constitutionally protected property interest.  <u>Keys v. City of Philadelphia</u>, 2005 U.S. Dist. LEXIS 30137 at *20 (E.D.Pa. Nov. 30, 2005) (Tucker, J.).  Here, defendants concede that Pennsylvania law confers a property interest upon police officers in their

continued employment.[7]  In addition, for purposes of this motion, defendants concede that they were acting under color of state law.[8]

Normally, procedural due process claims involve disputes concerning whether plaintiff was afforded constitutionally adequate process prior to discharge.  In Cleveland Board of Education v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) the United States Supreme Court held that the Due Process Clause of the Fourteenth Amendment of the United States Constitution requires that a tenured public employee is entitled to a hearing, oral and written notice of the charges against him, an explanation of the employers evidence, and the opportunity to present his side of the story.  In addition, the employee must be provided the opportunity to "present his case and have its merits fairly judged."  Logan v. Zimmerman Brush Co., 455 U.S. 422, 433, 102 S.Ct. 1148, 1156, 71 L.Ed.2d 265, 276 (1982).

In this case, plaintiff asserts a violation of procedural due process apart from the manner in which he was dismissed.  He claims that the language of the associations policy is so vague that it denied him procedural due process.

---

[7]    Defendants, City of Reading and William M. Heim's Memorandum of Law in Support of Motion for Summary Judgment Pursuant to Fed.R.Civ.P. 56, at page 14, n.4.

[8]    Id., at page 7.

Furthermore, plaintiff contends that the real reason for his firing was his alleged violation of the associations policy.  As noted above, I have concluded that the language of the associations policy is not unconstitutionally vague on its face for purposes of summary judgment.  Moreover, I have concluded that it is for the jury to determine whether plaintiff knew that the progressive discipline and reckoning period portions of the association policy were no longer effective.  If he did not, then the associations policy would be unconstitutionally vague as applied to plaintiff.

Defendants' argument — that plaintiff cannot prevail on his procedural due process claim because he only challenges the constitutionality of the associations policy and not the other three policies for which he was terminated — is essentially a causation argument.  In evaluating causation, "[i]t is axiomatic that '[a ] § 1983 action, like its state tort analogs, employs the principle of proximate causation.'" Hedges v. Musco, 204 F.3d 109, 121 (3d Cir. 2000) (quoting Townes v. City of New York, 176 F.3d 138, 146 (2d Cir. 1999)).

The United States Court of Appeals for the Third Circuit has stated that "[t]raditionally, in tort law, proximate cause has been defined as a person's wrongful conduct which is a substantial factor in bringing about harm to another." Egervary v. Young, 366 F.3d 238, 246 (3d Cir. 2004) (citing

-29-

Restatement (Second) of Torts § 431 (1965)).  Plaintiff contends that he was fired for one reason, his association with the Pagans.  Defendants contend that the four violations of General Order 0408 and plaintiff's prior conduct as a police officer, including prior disciplinary action against him, were the reasons his employment was terminated.

Under proximate cause, there can be other contributing factors to plaintiff's termination, but that does not vitiate his constitutional claim.  Plaintiff need only demonstrate that there was a constitutional violation under color of state law and that the violation was a cause of his injury (i.e. being fired from his job).  Just because the employer had other reasons for firing plaintiff does not mean that one unconstitutionally vague City policy was not one of the causes of his termination.

Proximate cause is always determined by a jury. Thabault v. Chait, 541 F.3d 512, 523 (3d Cir. 2008).  Thus, because defendant has given multiple reasons for plaintiff's firing and plaintiff contends that the real reason is only for a violation of one of them (the associations policy), it is for a jury to determine what was the proximate cause of plaintiff's firing.

Accordingly, I deny defendants' motion for summary judgment on that issue.

-30-

Defendants' Remaining Contentions

Defendants raise three additional contentions in their motion for summary judgment:  (1) plaintiff has not proved a violation of procedural due process because he received the process to which he was due; (2) Chief Heim is entitled to qualified immunity, and (3) plaintiff cannot prove municipal liability.

Plaintiff makes no argument regarding the process afforded him involving the termination of his employment. Plaintiff was notified of the charges against him.  Plaintiff was interviewed by Reading Police Lieutenant Weidner regarding his suspected association with the Pagans.

Police Captain Schaffer reviewed the investigative interviews and initiated recommendations for discipline.  Chief Heim reviewed plaintiff's interview with Lt. Weidner.  Plaintiff, along with a representative of the Fraternal Order of Police, had a meeting with Chief Heim and was provided the opportunity to present additional information at the meeting, before the Chief made a recommendation to the Reading Mayor regarding the charges.

Plaintiff had a full and fair hearing before the Reading City Council, where he was represented by counsel provided by the FOP, testified, and presented witnesses. Plaintiff appealed City Council's Resolution to private

arbitration.   During the private arbitration hearing, plaintiff was represented by counsel, testified, and presented witnesses.

Throughout the entire process the termination of plaintiff's employment was upheld at every level.

As noted above, the Due Process Clause of the Fourteenth Amendment of the United States Constitution entitles a tenured public employee to a hearing, oral and written notice of the charges against him, an explanation of the employers evidence, and the opportunity to present his side of the story. Not only must the employee be provided the opportunity to present his case, but he must also be provided the opportunity to have the merits of his case fairly judged.   See Loudermill, supra; Logan, supra.

A review of the record in this matter reveals that plaintiff was provided all of the process required by the Constitution.   In the absence of plaintiff arguing that he was denied some specific aspect of the procedural process to which he is entitled, I conclude that he was afforded all the process to which he was entitled concerning the manner of his dismissal.

However, because I have concluded, above, that plaintiff's challenge (to the associations policy as being void for vagueness as applied to him) survives, defendant City's motion for summary judgment is denied regarding Count I of plaintiff's Complaint.

Next, as noted above, plaintiff does not oppose defendants' motion for summary judgment on Count II of his Complaint.[9]  Count II alleges a claim against Chief Heim in his individual capacity.  Defendant Heim contends that he is entitled to qualified immunity.  Because plaintiff does not dispute that Chief Heim is entitled to qualified immunity, I grant defendants' motion for summary judgment and dismiss Count II from plaintiff's Complaint.

Finally, defendants contend that plaintiff cannot establish liability of the part of the City of Reading.

To prevail on a Monell[10] claim, a plaintiff must establish that: (1) the municipality had a policy or custom which deprived him of his constitutional rights; (2) the municipality acted deliberately and was the moving force behind the deprivation; and (3) his injury was caused by the identified policy or custom.  Pelzer v. City of Philadelphia, 656 F.Supp.2d 517, 531 (E.D.Pa. 2009)(Stengel, J.)(citing Board of the County Commisioners of Bryan County v. Brown, 520 U.S. 397, 403-404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)).

Here defendant City contends that plaintiff's Monell claim must fail because (1) plaintiff cannot establish an

---

[9]    See Plaintiff Mark Groff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment Pursuant to F.R.C.P. 56, at page 8.

[10]   Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

improper municipal policy; (2) plaintiff cannot establish an improper municipal custom; and (3) even if plaintiff establishes an improper policy or custom, he cannot demonstrate a direct casual link between the policy and the challenged employment action (in this case the termination of plaintiff's employment as a Reading Police Officer).

Plaintiff contends, on the contrary, that his employment was terminated as a result of policies promulgated by the City of Reading through the Chief of Police, the highest official in the Reading Police Department.  Moreover, the termination of his employment, based on those policies was recommended by the Chief of Police, approved by the Mayor, and upheld and affirmed by the Reading City Council.

The termination of plaintiff's employment was an official act by the highest levels of the City of Reading and confirmed by a specific resolution of the City Council.  Thus, plaintiff contends that he had not only identified a custom or policy but had shown a causal link between the policies and his termination.  I agree.

The basis for terminating plaintiff's employment, by defendants' own admission, is the violation of four subsections of General Order 0408.  Plaintiff asserts that one of those policies, the associations policy, is unconstitutionally vague. While I have concluded that it is not facially vague, I have also

-34-

concluded that the cause of plaintiff's termination and whether he was fully advised of the prohibitions and penalties for violation of the associations policy is a disputed issue of material fact that must be determined at trial by the jury. Specifically, the jury will determine whether General Order 0408 is unconstitutionally vague as applied to plaintiff.

Accordingly, I conclude that a jury could conclude that plaintiff has identified a possible improper municipal policy and that the policy is a direct cause of the termination of his employment as a police officer.  Thus, for the purposes of summary judgment, plaintiff has satisfied the elements of a <u>Monell</u> claim against the City of Reading.

CONCLUSION

For the foregoing reasons, I grant in part and deny in part defendants' motion for summary judgment.  I deny defendant City's motion for summary judgment regarding Count I of plaintiff's Complaint.  I grant defendant Chief Heim's motion for summary judgment regarding Count II of plaintiff's Complaint, and dismiss Count II from the Complaint.

-35-